# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NOAH J. ROSENKRANTZ *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>INTER-AMERICAN DEVELOPMENT BANK,<br><br>Defendant. | Civil Action No. 20-3670 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

Plaintiffs Noah J. Rosenkrantz, Christopher Thibedeau, and TTEK Inc. ("plaintiffs") bring this action against the Inter-American Development Bank ("IDB"), an international financial institution created by member states, including the United States, for the purpose of facilitating the economic and social development of developing countries in the Americas. The individual plaintiffs were affiliated with companies that entered into agreements with IDB and the Government of Barbados to provide services on IDB-financed projects. They stand accused of engaging in Prohibited Practices in relation to the performance of those contracts and, as a result, the individual plaintiffs and TTEK, an entity created by Thibedeau in 2016 and controlled by him, are now subject to internal IDB proceedings to determine whether they should face bank-imposed sanctions, including debarment prohibiting them from entering into future contracts with IDB.

Plaintiffs claim that IDB has breached the underlying contracts in the course of its internal proceedings against them by failing to comply with the Sanctions Procedures that govern its consideration of Prohibited Practices allegations, and seek an order preliminarily enjoining the "sanctions proceedings against [them] that are currently pending before the [IDB]." Pls.'

1

Mot. Prelim. Inj. ("Pls.' Mot.") at 1, ECF No. 8.  IDB, for its part, moves for dismissal of the

case, pursuant to Federal Rule of Civil Procedure 12(b)(1), contending that it is immune from

suit under the International Organizations Immunities Act of 1945 ("IOIA"), 22 U.S.C. §§ 288–

288l, and, as a result, the Court lacks subject-matter jurisdiction.  *See* Def.'s Mot. Dismiss

("Def.'s Mot.") at 1, ECF No. 18; Def.'s Combined Opp'n Pls.' Mot. Prelim. Inj. & Mem. Supp.

Def.'s Mot. Dismiss ("Def.'s Opp'n") at 14–21, ECF No. 18-1; Def.'s Reply Supp. Mot. Dismiss

("Def.'s Reply") at 2–10, ECF No. 23.  For the reasons set forth below, IDB's Motion to Dismiss

under Rule 12(b)(1) is granted and plaintiffs' Motion for Preliminary Injunction therefore must

be denied.[1]

# I.    BACKGROUND

## A.    Factual Background

As resolution of IDB's motion to dismiss pursuant to Rule 12(b)(1) turns on the legal

question of its immunity from suit, the relevant facts are described only briefly.

### 1.    *The Inter-American Development Bank*

#### a.    Formation and Charter

The IDB is an international financial institution, created in 1959 by member countries

including the United States, with "[t]he purpose of . . . contribut[ing] to the acceleration of the

process of economic and social development of the regional developing member countries,

individually and collectively."  Pls.' Mot., Ex. 16, Agreement Establishing the Inter-Am. Dev.

Bank ("IDB Charter") art. I, § 1, Apr. 8, 1959, 10 U.S.T. 3068, ECF No. 8-18; *see also* Decl. of

---

[1]    IDB also moves in the alternative to dismiss for failure to state a claim upon which relief could be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Def.'s Mot. at 1.  As the finding that subject-matter jurisdiction has not been established requires that the case be fully dismissed, this alternative ground for dismissal need not be addressed.  *See, e.g.*, *Mirv Holdings, LLC v. GSA*, 454 F. Supp. 3d 33, 45 (D.D.C. 2020) ("grant[ing] the defendant's motion to dismiss pursuant to Rule 12(b)(1)" and therefore "deny[ing] as moot the motion in all other respects").

Brigida Benitez ("Benitez Decl.") ¶ 18, ECF No. 19-1.  In furtherance of its objective of

promoting economic and social development, IDB "provid[es] loans and grants to governments

and government-controlled entities in its borrowing member countries," primarily in the Latin

American and Caribbean regions, "which use the resources to fund development activities."

Def.'s Opp'n at 3.  The bank also "provides technical assistance to its borrowers" and "uses its

funds to purchase goods and services directly to support its activities and those of its borrowing

countries."  *Id*. at 4.

In order to prevent interference by any member country's courts in IDB affairs, Article

XI of the IDB Charter enumerates a list of "status, immunities, and privileges" that must "be

accorded to the Bank in the territories of each member" and sets forth limited conditions under

which IDB may be sued.  IDB Charter art. XI, § 1.  Of particular relevance here, Article XI,

section 3 of the Charter specifies that "[a]ctions may be brought against the Bank only in a court

of competent jurisdiction in the territories of a member in which the Bank has an office, has

appointed an agent for the purpose of accepting service or notice of process, or has issued or

guaranteed securities.  No action shall be brought against the Bank by members or persons acting

for or deriving claims from members."  *Id.* art XI, § 3.  The United States has "accept[ed]

membership" in the IDB pursuant to the IDB Charter, 22 U.S.C. § 283, and the immunities and

privileges set forth in Article XI of the IDB Charter thus "have full force and effect in the United

States," *id.* § 283g.  In addition, IDB has twice been recognized by the United States to be an

"international organization" as defined in the IOIA.  *See* Exec. Order No. 10,873, 25 Fed. Reg.

3,097 (Apr. 8, 1960); Exec. Order No. 11,019, 27 Fed. Reg. 4,145 (Apr. 27, 1962).

**b.**     **Sanctions Process**

The IDB Charter requires the bank to "take the necessary measures to ensure that the proceeds of any loan made, guaranteed, or participated in by the Bank are used only for the purposes for which the loan was granted."  IDB Charter art. III, § 9(b).  To fulfill this duty, IDB has adopted internal policies prohibiting all parties involved in IDB-financed activities from engaging in corruption, fraud, coercion, collusion, obstruction, and misappropriation, known collectively as "Prohibited Practices."  Pls.' Mot., Ex. 5, IDB, Sanctions Procedures ("Sanctions Procedures") § 2.2 (2020), ECF No. 8-7; *see also* Benitez Decl. ¶ 10.  The ban on Prohibited Practices applies not only to "parties who contract with the Bank," but also to "any party involved" in an IDB-financed project, "whether by virtue of a contract" with IDB or a member of IDB, or because of a relationship with any of a number of "other parties," including IDB borrowers, grant recipients, bidders, suppliers, contractors and subcontractors, service providers, among others, and any "officers, employees and agents" of such entities.  Sanctions Procedures § 1.2; *see also id.* § 2.2.  These prohibitions are enforced through a sanctions process that follows the guidelines set forth in IDB's Sanctions Procedures, which outline a multi-step internal administrative and quasi-judicial review process by which the bank identifies and penalizes Prohibited Practices.  *See generally id.* §§ 3–15.

At the first step in the process, IDB's Office of Institutional Integrity ("OII") investigates "allegations of Prohibited Practices."  *Id.* § 3.1.  If OII "believes that a preponderance of the evidence supports a finding of a Prohibited Practice," *id.* § 3.3, the office presents to a Sanctions Officer appointed by the IDB President, *see id.* § 3.2, "a Statement of Charges and Evidence," identifying each respondent alleged to have engaged in a Prohibited Practice, the nature of the Prohibited Practice, and the facts underlying the charges, *id.* §§ 3.3–3.4.  OII must "attach all evidence relevant to the determination of a sanction then available to OII," *id.* § 3.4.4, and "all

exculpatory or mitigating evidence in the possession of OII," with limited exceptions, to the Statement of Charges, *id.* § 3.4.5; *see also id.* § 10.2.

Next, the Sanctions Officer reviews the Statement of Charges and again "determine[s] whether a preponderance of the evidence supports a finding that the Respondent engaged in a Prohibited Practice."  Sanctions Procedures § 4.1.  Upon finding that this standard is met, the Sanctions Officer "prepare[s] a Notice" to be sent to the respondent, *id.* § 4.5, consisting of the Statement of Charges, all evidence submitted to the Sanctions Officer by OII, the Sanctions Officer's findings, an explanation of the respondent's right to respond to the charges, and a description of the potential sanctions, *id.* § 4.6.  A respondent has sixty days after receipt of a Notice to "submit written materials to the Sanctions Officer including arguments and evidence." *Id.* § 4.7.

At the close of this period, the Sanctions Officer "assess[es] the submissions of OII and (if any) of the Respondent and . . . issue[s] a Determination."  Sanctions Procedures § 4.9.  If the Sanctions Officer concludes by "a preponderance of the evidence" that the respondent "engaged in a Prohibited Practice," she may impose an appropriate sanction, *id.* § 4.9.2, ranging in severity from a formal reprimand to debarment, "a determination that a Respondent is ineligible, either permanently or for a stated period of time, to be awarded and/or participate in additional contracts for [IDB] Projects," *id.* § 8.2.  Though a debarment does not necessarily prevent a sanctioned entity or individual from participating in certain IDB-financed projects as a non-contracting party, IDB "may decide not to authorize such participation on the basis of integrity risk or other considerations."  *Id.* § 8.2.2.  Parties subject to sanctions may include not only the respondent but also any entity that a respondent owns or controls, in whole or in common with others.  *Id.* § 8.3.  Under the Sanctions Procedures, "[t]he imposition of any Sanction shall be

public," *id.* § 8.2, and IDB is permitted to disclose "information concerning the identity of each sanctioned party, the Prohibited Practice, and the Sanction imposed," as it "deem[s] appropriate," *id.* § 14.1.

A respondent who made a submission to the Sanctions Officer "may appeal the Sanctions Officer's Determination . . . in writing" to the Sanctions Committee within forty-five days of the Determination.  Sanctions Procedures § 6.1.  OII "may submit additional written materials" to the Committee, *id.* § 6.2, but any additional "evidence presented . . . to the Committee by OII" must be provided to the respondent, *id.* § 10.2.  The Sanctions Officer may not be a member of the Sanctions Committee that reviews the Determination.  *Id.* § 3.2.  The Committee considers the entire record that was presented to the Sanctions Officer to determine for a third time "whether a preponderance of the evidence supports a finding that the Respondent engaged in a Prohibited Practice."  *Id.* § 7.1.  If the Committee finds that this standard is met, it "prepare[s] a Decision summarizing the Committee's findings and imposing a Sanction on the Respondent." *Id.* § 7.3.  The Committee's Decision is "final" and "take[s] effect immediately."  *Id.*

The Sanctions Procedures merely "guide the exercise of discretion" by IDB in enforcing its ban on Prohibited Practices through the sanctions process and "do not in themselves confer any rights or privileges to any party."  Sanctions Procedures § 15.1.  With respect to immunity, the Procedures explicitly state that "[n]othing in these Procedures shall be considered to alter, abrogate, or waive the immunities and privileges as set forth in" the IDB Charter and other agreements among member countries.  *Id.* § 15.2.

### 2.  *The IDB-Financed Contracts*

Plaintiffs allege that IDB's failure to comply with the Sanctions Procedures explained above breached three IDB-financed contracts, each of which is described in turn.  The first of the contested contracts is a January 2010 agreement between GreenLine Systems, Inc.

("GreenLine") and IDB for GreenLine to provide an automated customs risk management system and related services to Barbados (the "ACRMS Contract").  *See* Compl. ¶¶ 20, 25; Pls.' Mot., Ex. 1, Contract Between IDB & GreenLine Sys., Inc. (Jan. 21, 2010) ("ACRMS Contract"), ECF No. 8-3; Benitez Decl. ¶ 6.  GreenLine was awarded this contract through a competitive bidding process.  Compl. ¶¶ 21–24.  When the contract was formed, Rosenkrantz was the co-founder, CEO, and Chairman of GreenLine and Thibedeau was a GreenLine Vice President for World Wide Customs and Regulatory Law Enforcement Solutions, *id.* ¶ 23, but neither of the individual plaintiffs was a direct party to the agreement, *see id.* ¶¶ 24–26; ACRMS Contract at 9.  The ACRMS Contract specifies that "no promises, terms, conditions, or obligations other than those contained herein" exist between the parties and makes no reference to the Sanction Procedures.  ACRMS Contract ¶ 9; *see also id.* ¶ 3.  Performance of this contract was completed in 2010.  Compl. ¶ 25.

The second contract is a November 2010 agreement between GreenLine and IDB for GreenLine to provide a "Knowledge and Capacity Product," a product similar to a study, "on the subject of best practices for cross-border risk management of cargo and passengers, which IDB would publish and make available globally" (the "KCP Contract").  *Id.* ¶ 29; *see also id.* ¶ 30; Pls.' Mot., Ex. 2, Contract Between IDB & GreenLine Sys., Inc. (Nov. 8, 2010) ("KCP Contract"), ECF No. 8-4; Benitez Decl. ¶ 7.  Like the ACRMS contract, this contract was awarded directly to GreenLine by IDB.  Compl. ¶¶ 29–30, 32.  Again, though Rosenkrantz and Thibedeau remained in their respective roles at GreenLine, neither was a direct party to the agreement.  *See id.* ¶¶ 30, 32, 35; KCP Contract at 5.  The KCP Contract, like the ACRMS Contract, explicitly states that "no promises, terms, conditions or obligations other than those

contained herein" bind the parties and does not refer to the Sanctions Procedures.  KCP Contract ¶ 8.  All work on the KCP Contract was completed by the end of 2010.  Compl. ¶ 30.

In October 2013, before the third IDB-financed contract was formed, GreenLine was acquired by A-T Solutions, Inc. ("ATS").  *Id.* ¶ 35.  Rosenkrantz left GreenLine at the time of the acquisition, while Thibedeau stayed on as a Vice President of ATS.  *Id.* ¶¶ 35–36.  The sale was governed by a purchase agreement (the "GreenLine Purchase Agreement") which, according to plaintiffs, obligated ATS and the "GreenLine Securityholders," a group of twenty-eight individuals that included Rosenkrantz and Thibedeau, *id.* ¶ 18, to "cooperate fully with each other in connection with the defense, negotiation or settlement of any Indemnifiable Claim," *id.* ¶ 62.  Plaintiffs allege that ATS and its successors in interest are therefore contractually obligated to facilitate for GreenLine Securityholders "the retention and provision of records and information reasonably relevant to such Indemnifiable Claim[s]," as well as access to "employees . . . to provide additional information and explanation of any material provided" pursuant to this duty.  *Id.*

The Government of Barbados opened competitive bidding on the last of the contracts, for an IDB-financed project "to build an electronic single window ('ESW') system to modernize and simplify cross-border operations" (the "ESW Contract"), in late 2014.  Compl. ¶ 37.  Barbados awarded the ESW Contract to ATS some time after March 2015, and the parties entered negotiations as to the terms.  *Id.* ¶¶ 39–40.  In July 2015, the ESW Contract between ATS and the Government of Barbados was finalized.  *Id.* ¶ 40; *see also* Pls.' Mot., Ex. 3, Memorandum of Understanding Between the Government of Barbados & ATS (July 13, 2015) ("ESW Contract"), ECF No. 8-5; Benitez Decl. ¶ 8.  Recall that, by this time, Rosenkrantz had already departed ATS, and Thibedeau remained as a Vice President.  *See* Compl. ¶¶ 35–36.  Neither of these

plaintiffs nor IDB was a party to the ESW Contract, although IDB provided financing pursuant to a loan agreement with the Government of Barbados. *Id.* ¶¶ 37, 40; *see* Pls.' Mot., Ex. 4, Loan Contract No. 2278/OC-BA Between the Government of Barbados & IDB (Mar. 21, 2010), ECF No. 8-6; Benitez Decl. ¶ 9. The ESW Contract thus required that all participants in the project comply with IDB's "Applicable Policies in regard to fraud and corruption and prohibited practices." ESW Contract ¶ 34 (emphasis omitted); *see also id.*, Attach. 1, § 1.1.[2] The contract was successfully completed, and the ESW launched in early 2017. Compl. ¶¶ 40, 42.

While negotiations over the ESW Contract were in progress, in June 2015, ATS was acquired by Pacific Architects and Engineers ("PAE"). *Id.* ¶ 56. PAE is therefore ATS's successor-in-interest under the GreenLine Purchase Agreement, *id.* ¶ 18, while its subsidiary GL Systems LLC ("GL Systems") is the successor to the legacy businesses of both GreenLine and ATS, *see id.* ¶¶ 87, 89; Pls.' Mem. P. & A. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Mem.") at 9–10, ECF No. 8-1; Def.'s Opp'n at 11. Thibedeau, who remained in his position as an ATS Vice President at the time of the PAE acquisition, became a PAE employee, but left the company in April 2016. Pls.' Mem. at 4. At this time, he formed TTEK as a Barbados corporation under his control. *See* Compl. ¶¶ 3, 95.

### 3.    *Sanctions Proceedings Against Plaintiffs*

In 2015, OII initiated an investigation of alleged Prohibited Practices in relation to certain IDB-financed contracts, which eventually came to include the ACRMS Contract, the KCP Contract, and the ESW Contract. *See* Compl. ¶¶ 57, 60; Def.'s Opp'n at 9; Decl. of Ignacio Herrera ("Herrera Decl.") ¶¶ 10–11, ECF No. 18-2. PAE, as the entity which had acquired

---

[2]        Though not addressed by the parties, the ESW Contract also contains a choice of law and choice of forum provision, stating that the agreement "shall be governed by the Laws of Barbados and litigated in the Law Courts of Barbados." ESW Contract ¶ 41.

GreenLine and ATS's businesses, cooperated in the investigation at OII's request. *See* Compl. ¶ 59; Herrera Decl. ¶¶ 12–14. Plaintiffs allege that "IDB . . . instruct[ed] PAE not to cooperate with the GreenLine Securityholders in relation to the investigation," Compl. ¶ 64, and, as a result, PAE "declined" to provide the GreenLine Securityholders with "records relating to the investigation," its obligations under the indemnification provision of the GreenLine Purchase Agreement notwithstanding, *id.* ¶ 69; *see also id.* ¶¶ 65–72.

Three years after the investigation began, in April 2018, OII requested to interview Rosenkrantz and Thibedeau, *id.* ¶ 73, and soon after, provided them with approximately 2,500 pages of potentially relevant records out of the nearly 300,000 pages plaintiffs believe OII collected from PAE in the course of its investigation, *id.* ¶ 75. OII next issued "Show Cause" letters to Rosenkrantz and Thibedeau, alleging that they had engaged in Prohibited Practices, outlining the evidence found by OII in support of the allegations, and providing some additional documents. *Id.* ¶ 80; Herrera Decl. ¶¶ 27–29. Pursuant to the IDB's Sanctions Procedures, Rosenkrantz and Thibedeau were given until August 22, 2018 to submit a written response to the allegations. Compl. ¶ 80.

On August 21, 2018, IDB announced that it had executed a negotiated resolution agreement with GL Systems, the PAE subsidiary that was the successor to GreenLine and ATS's business, to resolve allegations of Prohibited Practices "in connection with . . . three IDB-financed activities: (i) the Program for the Modernization of Customs, Excise and VAT Areas in Barbados, (ii) the Barbados Competitiveness Program, and (iii) an IDB corporate procurement contract." Pls.' Mot., Ex. 14, Press Release, IDB, IDB Announces Settlement in Connection with Prohibited Practices (Aug. 21, 2018) ("Press Release") at 1, ECF No. 8-16; *see also* Benitez Decl. ¶ 16; Compl. ¶¶ 84–85. The press release stated that GL Systems would be debarred for

four years as a penalty and that "GL Systems entered into the Settlement Agreement on behalf of itself and the custom software product lines of the business formerly known as GreenLine Systems, Inc. and A-T Solutions, Inc."  Press Release at 1.

Several months later, in December 2018, OII concluded that Rosenkrantz and Thibedeau had engaged in Prohibited Practices and issued a Statement of Charges and Evidence.  *See* Def.'s Reply, Ex. 1, IDB Group, OII, Case No. CA-BA-2015-2335, Statement of Charges & Evidence (Dec. 28, 2018), ECF No. 23-1.  The Statement of Charges named Rosenkrantz and Thibedeau as "Respondents" and designated TTEK as an "[o]ther part[y] subject to sanctions" because it is an entity controlled by Thibedeau.  *Id.*  In compliance with the Sanctions Procedures, the sixty-page Statement of Charges detailed the evidence against plaintiffs and OII's findings and attached over 6,700 pages of relevant, exculpatory, or mitigating evidence and information in OII's possession.  Herrera Decl. ¶¶ 31–36.

In May 2019, an IDB Sanctions Officer issued Notices of Administrative Action, including copies of the Statement of Charges and all attached evidence, to plaintiffs.  Compl. ¶ 95; Herrera Decl. ¶¶ 37–38.  Plaintiffs submitted their responses to the Statement of Charges to the Sanctions Officer in August 2019.  Compl. ¶ 96; Herrera Decl. ¶ 39.  In May 2020, the Sanctions Officer issued Determinations, as set forth in the Sanctions Procedures, finding that Rosenkrantz and Thibedeau had engaged in Prohibited Practices and debarring all three plaintiffs from being awarded or participating in IDB-financed contracts for terms ranging from four to ten years.  Compl. ¶ 97; Herrera Decl. ¶ 40.  Plaintiffs timely appealed the determinations to the IDB's Sanctions Committee, the body charged with reviewing de novo Sanctions Officers' Determinations and issuing a final Decision.  Compl. ¶ 98; *see supra* Part I.A.1.b.  Briefing of

11

the appeal was completed in January 2021; no hearing has been scheduled to date.  Herrera Decl. ¶¶ 48–49.

### B.    Procedural History

On December 14, 2020, plaintiffs initiated the instant suit, alleging that the sanctions proceedings against them violated IDB's Sanctions Procedures, and therefore breached IDB's obligations under the ACRMS Contract, the KCP Contract, and the ESW Contract, in three ways.  *See generally* Compl.  First, plaintiffs claim that IDB "instruct[ed] PAE not to cooperate with them or permit their access to the . . . records [held by PAE]," contrary to PAE's obligations to plaintiffs, as GreenLine Securityholders, under the GreenLine Purchase Agreement, and "refused" to provide the majority of the 300,000 pages produced to OII by PAE, Pls.' Mem. at 9; *see also* Compl. ¶¶ 65–79, in violation of the Sanctions Procedures' requirement that all relevant, exculpatory, or mitigating evidence in OII's possession be provided to Respondents, *see* Sanctions Procedures §§ 3.4.4, 3.4.5, 10.2.  Second, plaintiffs assert that IDB violated the Sanctions Procedures by disclosing its settlement with PAE, via GL Systems, in a press release before Thibedeau and Rosenkrantz had submitted their responses to the Sanctions Officer.  *See* Compl. ¶¶ 78–94; Pls.' Mem. at 9–10.  Finally, plaintiffs charge, in an argument not clearly alleged in their Complaint, that TTEK, which was named in the Statement of Charges as an "other" party subject to sanctions but not as a respondent, was wrongfully charged by IDB because it was not a party to any of the three challenged contracts nor involved in their performance and therefore is not subject to the Sanctions Procedures.  Pls.' Mem. at 10.

These allegations underlie three claims that IDB, through its alleged noncompliance with the Sanctions Procedures, breached its contractual duties to plaintiffs (Count I), Compl. ¶¶ 104–08; violated its implied duty of good faith and fair dealing under the contracts (Count II), *id.*

¶¶ 109–14; and tortiously interfered with PAE's performance of its obligations to plaintiffs under the GreenLine Purchase Agreement (Count III), *id.* ¶¶ 115–19.

Approximately six weeks after initiating this lawsuit, on February 1, 2021, plaintiffs filed the pending motion for preliminary injunctive relief. *See* Pls.' Mot. A schedule for briefing on this motion as proposed by the parties, with briefing on the motion to be ripe by March 4, 2021, was adopted by the Court. *See* Min. Order (Feb. 4, 2021). IDB indicated that it intended to file a motion to dismiss under Rule 12(b)(1) and, as a result, the scheduling order was modified to provide for simultaneous briefing of plaintiffs' motion for preliminary injunction and IDB's motion to dismiss, *see* Min. Order (Feb. 9, 2021), which motion was submitted on February 17, 2021, *see* Def.'s Mot. All briefing was completed by March 11, 2021, *see* Def.'s Reply, and both motions are now ripe for resolution.

## II.     LEGAL STANDARD

### A.     Motion to Dismiss for Lack of Subject-Matter Jurisdiction

To survive a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), plaintiffs bear the burden of demonstrating the court's subject-matter jurisdiction over their claims by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). "[F]ederal courts are courts of limited subject-matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants jurisdiction.'" *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (alterations in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)); *see also Gunn v. Minton*, 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))). They therefore have a corresponding "independent obligation to

13

ensure that they do not exceed the scope of their jurisdiction" and "must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). Absent subject-matter jurisdiction over a case, the court must dismiss it. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)); Fed. R. Civ. P. 12(h)(3).

When considering a motion to dismiss under Rule 12(b)(1), the court must accept as true all uncontroverted material factual allegations in the complaint and "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged' and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)); *see also Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020) ("Where . . . the 'defendant contests only the legal sufficiency of plaintiff's jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief.'" (quoting *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 398 (D.C. Cir. 2018))). The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

When a jurisdictional challenge "present[s] a dispute over the factual basis of the court's subject matter jurisdiction . . . the court must go beyond the pleadings and resolve" any dispute necessary to the disposition of the motion to dismiss. *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (alteration in original) (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). In such situations, "the . . . court may properly consider

14

allegations in the complaint and evidentiary material in the record," affording the plaintiff "the benefit of all reasonable inferences." *Id.*; *see also Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) ("In considering a motion to dismiss for lack of subject matter jurisdiction," the court "'may consider materials outside the pleadings[.]'" (quoting *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005))).

### B.      Motion for Preliminary Injunction

A preliminary injunction "is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  To obtain relief, the moving party must establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities" is in their "favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016).  The first factor is also the "most important factor." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, 'a likelihood of success on the merits.'" (quoting *Gonzales v. O Centro Espirita Beneficente União do Vegetal*, 546 U.S. 418, 428 (2006))).[3]  A

---

[3]      The D.C. Circuit has previously followed a "sliding scale" approach to evaluating preliminary injunctions, but that approach is likely inconsistent with *Winter*, *see Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned"); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that "this Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with the Supreme Court's recent decisions in" *Winter* and *Munaf*), and therefore will not be employed here, *see Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 16 n.6 (D.D.C. 2020); *Singh v. Carter*, 185 F. Supp. 3d 11, 16–17 (D.D.C. 2016).

preliminary injunction "is an extraordinary . . . remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" on each of the four factors. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted) (quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, at 129–30 (2d ed. 1995)).

## III.   DISCUSSION

IDB contends that, because it is immune from suit under the IOIA, the Court lacks subject-matter jurisdiction.  As a result, it posits, this case should be dismissed and plaintiffs' Motion for Preliminary Injunction should be denied.  *See* Def.'s Opp'n at 14–21; Def.'s Reply at 2–10.  Before evaluating the availability of preliminary relief, "the Court must first determine that it may properly exercise jurisdiction over the action."  *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 203 (D.D.C. 2011).  IDB's Motion to Dismiss under Rule 12(b)(1) therefore must be decided before plaintiffs' Motion for Preliminary Injunction may be considered.  *See, e.g.*, *Am. Hosp. Ass'n v. Hargan*, 289 F. Supp. 3d 45, 55 (D.D.C. 2017) (denying a motion for preliminary injunction as moot after determining that "the Court must necessarily dismiss Plaintiffs' action for want of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure").

As the basis for its Rule 12(b)(1) motion, IDB asserts its presumed immunity as an international organization covered by the IOIA.  *See* Def.'s Opp'n at 14–21; Def.'s Reply at 2–10.  Plaintiffs counter that their claims satisfy the requirements of the commercial-activity and waiver exceptions to IOIA immunity, and that the Court therefore has subject-matter jurisdiction notwithstanding IDB's status as an international organization.  *See* Compl. ¶¶ 6–10; Pls.' Mem. at 30–34; Pls.' Combined Mem. L. & A. Opp'n Def.'s Mot. Dismiss & Reply Supp. Pls.' Mot.

Prelim. Inj. ("Pls.' Reply") at 4–18, ECF No. 19.  The scope of IDB's immunity under the IOIA, and the applicability of the two exceptions to abrogate that immunity in the instant case, are discussed in turn.

### A. Immunity of International Organizations

The IOIA confers upon international organizations "the same immunity from suit . . . as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity."  22 U.S.C. § 288a(b).  For purposes of the statute, an "international organization" is "a public international organization in which the United States participates . . . and which shall have been designated by the President through appropriate Executive order as being entitled" to immunity under the IOIA.  *Id.* § 288.  The IDB has been so designated on two occasions, and therefore qualifies for immunity under the IOIA.  *See* Exec. Order No. 10,873, 25 Fed. Reg. at 3,097; Exec. Order No. 11,019, 27 Fed. Reg. at 4,145.  The Supreme Court recently determined that the IOIA "continuously link[s] the immunity of international organizations to that of foreign governments, so as to ensure ongoing parity between the two," *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 768 (2019), and thus, "[t]oday, . . . the Foreign Sovereign Immunities Act governs the immunity of international organizations," *id.* at 772.

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611, provides that foreign governments "shall be immune from the jurisdiction of the courts of the United States and of the States," *id.* § 1604, and therefore creates a presumption that both foreign governments and international organizations are immune from suit, *see TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 299 (D.C. Cir. 2005) (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)).  This presumption is subject to several statutory exceptions, *see* 28 U.S.C. §§ 1605–1605B, 1607, "which provide 'the sole basis for obtaining jurisdiction over a foreign state [or international organization] in our courts,'" *LLC SPS Stileks v. Republic of Moldova*, 985 F.3d

17

871, 877 (D.C. Cir. 2021) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488

U.S. 428, 434 (1989)); *accord Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 709 (2021).

"[T]he FSIA exceptions are exhaustive; if no exception applies, the district court has no

jurisdiction." *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014). "[T]he

plaintiff bears the initial burden to . . . produc[e] evidence that an [FSIA] exception applies, and

once shown, the sovereign [or organization] bears the ultimate burden of persuasion to show the

exception does not apply." *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d

1175, 1183 (D.C. Cir. 2013) (internal citations omitted); *see also EIG Energy Fund XIV, L.P. v.

Petroleo Brasileiro, S.A.*, 894 F.3d 339, 344–45 (D.C. Cir. 2018). Under this standard, unless an

exemption asserted by plaintiffs applies, IDB is immune from suit and the Court lacks subject-

matter jurisdiction. Plaintiffs allege that the instant case falls within two exceptions to immunity

under the FSIA, the commercial-activity exception, 28 U.S.C. § 1605(a)(2), and the waiver

exception, *id.* § 1605(a)(1); *see* Compl. ¶¶ 6–10; Pls.' Mem. at 30–34; Pls.' Reply at 4–18. The

applicability of each of these exceptions to plaintiffs' claims is considered next.

### B.      FSIA's Commercial-Activity Exception Is Inapplicable

Plaintiffs first argue that the commercial-activity exception applies to abrogate IDB's

immunity. *See* Compl. ¶¶ 7–9; Pls.' Mem. at 30–32; Pls.' Reply at 4–16. The commercial-

activity exception, as relevant here, permits suit against an international organization when "the

action is based upon" either "a commercial activity carried on in the United States by the

[international organization]" or "an act performed in the United States in connection with a

commercial activity of the [international organization] elsewhere." 28 U.S.C. § 1605(a)(2). To

determine whether the exception applies, a court undertakes a three-part analysis that (1)

identifies the "particular conduct on which the plaintiff's action is based," *OBB Personenverkehr

AG v. Sachs*, 136 S. Ct. 390, 395 (2015) (alterations and internal quotation marks omitted); (2)

evaluates whether that conduct is commercial in nature, *see* 28 U.S.C. §§ 1603(d), 1605(a)(2);

and (3) considers whether the conduct has "a sufficient nexus to the United States" under the

FSIA, *Jam,* 139 S. Ct. at 772.  All three requirements must be satisfied to overcome an

international organization's immunity.  *See Jam v. Int'l Fin. Corp.*, 442 F. Supp. 3d 162, 171

(D.D.C. 2020); *Rodriguez v. Pan Am. Health Org.*, Civ. A. No. 20-928 (JEB), 2020 WL

6561448, at *5 (D.D.C. Nov. 9, 2020).

 Analysis of the applicability of the commercial-activity exception to the instant case

"starts and ends" with the question of whether plaintiffs' suit is based upon "commercial

activity."  *Jam*, 442 F. Supp. 3d at 171.  Plaintiffs contend that their claims are based upon the

commercial activities of "IDB's investigation and audit process under the contractually-applied

Sanctions Procedures," Pls.' Mem. at 32, and alleged "breaches of contractually imposed

procedures applicable to [the sanctions proceedings against plaintiffs] . . . and related

interference," Pls.' Reply at 6.  IDB counters that the suit is in fact based upon IDB's alleged

denial of "certain procedural protections" to plaintiffs "during a fraud and corruption

investigation by a public international organization and in subsequent quasi-judicial proceedings

to bar them from receiving international development contracts," Def.'s Opp'n at 19; *see also*

Def.'s Reply at 4–5, activities that "were manifestly not commercial in nature," Def.'s Opp'n at

16.

 As explained below, IDB has the better of the argument.  Plaintiffs' suit is based upon

alleged violations of the Sanctions Procedures by IDB in the course of its investigation and

prosecution of Prohibited Practices charges against plaintiffs.  The process by which IDB

undertakes and prosecutes such charges, pursuant to its Sanctions Procedures, is the type of

activity by which government entities defend against fraud and corruption in the use of public

funds.  Plaintiffs therefore have not established that the gravamen of the Complaint—IDB's alleged violations of its own Sanctions Procedures—constitutes commercial activity.

### 1.    *Principles Applicable to Identifying Claims "Based Upon" Commercial Activity*

"The [FSIA's] 'based upon' inquiry . . . first requires a court to 'identify[] the particular conduct on which the [plaintiff's] action is 'based.'"  *Sachs*, 136 S. Ct. at 395 (alterations in original) (quoting *Nelson*, 507 U.S. at 356), that is, "the 'particular conduct' that constitutes the 'gravamen' of the suit," *id.* at 396; *see also Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017) ("[A] court's jurisdiction under the Foreign Sovereign Immunities Act turns on the 'gravamen,' or 'essentials,' of the plaintiff's suit." (quoting *Sachs*, 136 S. Ct. at 395, 396, 397)); *Valambhia*, 964 F.3d at 1144 ("An action is based upon the particular conduct that constitutes the gravamen of the suit." (internal quotation marks omitted)).  The emphasis in this inquiry is on "'the core of [the plaintiffs'] suits,' *i.e.*, 'the . . . acts that actually injured them,'" *Petersen Energía Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194, 206 (2d Cir. 2018) (alteration and omission in original) (quoting *Sachs*, 136 S. Ct. at 396), although the fact that an activity "led to the conduct that eventually injured" plaintiffs or "would establish a single element of a claim" is not independently sufficient to show that the suit is "based upon" that activity, *Sachs*, 136 S. Ct. at 395 (internal quotation marks omitted); *see also Nelson*, 507 U.S. at 357–58.  Thus, a reviewing court should not "individually analyz[e] each of the [plaintiffs'] causes of action," but instead must "zero[] in on the core of [the plaintiffs'] suit."  *Sachs*, 136 S. Ct. at 396; *see also Jam*, 442 F. Supp. 3d at 175 ("[T]his Court adopts a more holistic approach" to identifying the gravamen of the suit, "considering 'the basis or foundation' for plaintiffs' claims." (quoting *Sachs*, 136 S. Ct. at 396–97)).  "[A]ny other approach would allow plaintiffs to evade the [FSIA]'s restrictions through artful pleading."  *Sachs*, 136 S. Ct. at 396.

Once the gravamen of the suit is identified, analysis shifts to the question of whether that conduct consists of "commercial activity" or is taken "in connection with a commercial activity." 28 U.S.C. § 1605(a)(2).  The FSIA defines "commercial activity" as "a regular course of commercial conduct or a particular commercial transaction or act."  *Id.* § 1603(d).  Under this definition, a foreign government "engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns."  *Nelson*, 507 U.S. at 360 (internal quotation marks omitted); *see also Republic of Argentina v. Weltover, Inc.* ("*Weltover*"), 504 U.S. 607, 614 (1992) (finding that a foreign government's acts are "commercial" when it "acts, not as a regulator of a market, but in the manner of a private player within" that market).  The statute further specifies that an activity's "commercial character" is "determined by reference to the nature of the course of conduct or particular transaction or act, rather than . . . to its purpose."  28 U.S.C. § 1603(d).  Thus, "the question is not whether the [international organization] is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives," but instead "whether the particular actions that the [international organization] performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce."  *Weltover*, 504 U.S. at 614 (internal quotation marks omitted); *see also Jam*, 139 S. Ct. at 772; *de Csepel v. Republic of Hungary*, 714 F.3d 591, 599 (D.C. Cir. 2013).  At bottom, if the conduct alleged "'is the sort of action'" that is "'typically performed by participants in the market,'" it is commercial activity.  *Mwani v. bin Laden*, 417 F.3d 1, 16–17 (D.C. Cir. 2005) (quoting *Nelson*, 507 U.S. at 362).

## 2.    *Plaintiffs' Claims Are Not "Based Upon" Commercial Activity*

Plaintiffs urge that the gravamen of their suit consists of IDB's "breaches of contractually imposed procedures applicable to internal administrative procedures, breach of the covenant of

good faith and fair dealing in administering the [Sanctions] Procedures, and related interference by the Bank" in PAE's performance of the GreenLine Purchase Agreement, Pls.' Reply at 6, claims that "describe[] activity that is commercial in nature," *id.* at 7.  Under the standard outlined above, however, plaintiffs' crafting of their causes of action as contract and contract-related claims, *see* Compl. ¶¶ 104–19, cannot obscure the gravamen of their suit and is not determinative of whether the conduct at issue constitutes commercial activity, *see Sachs*, 136 S. Ct. at 396–97; *Jam*, 442 F. Supp. 3d at 171–72.  Rather, the gravamen of the instant claims against IDB is the "particular conduct" by which plaintiffs contend that they were aggrieved. Plaintiffs allege that they have been injured by IDB (1) "blocking" their access to relevant, exculpatory, or mitigating evidence in the organization's or PAE's possession, Compl. ¶ 107; *see also id.* ¶¶ 17, 65–79, 112, 117–19; (2) disclosing its settlement with GL Systems before plaintiffs had the opportunity to respond to the charges against them, *see id.* ¶¶ 17, 78–94, 107, 112; and (3) charging TTEK in the sanctions proceedings, *see* Pls.' Mem. at 10.  All of this conduct, in plaintiffs' view, violated the procedural requirements set forth in IDB's Sanctions Procedures which, plaintiffs claim, were "contractually imposed."  Compl. ¶ 106; *see also supra* Part I.A.2, I.A.3.

Plaintiffs' characterization of these allegations as claims for breach of contractual duties and tortious interference with a contractual relationship notwithstanding, at their core, they are challenges to IDB's alleged failure to adhere to its Sanctions Procedures in the course of the Prohibited Practices proceedings against plaintiffs.  The underlying contracts may have led to the proceedings, but still are not the gravamen of plaintiffs' suit, which plainly contests, through the guise of contractual claims, the process by which IDB may eventually sanction plaintiffs.  *See Nelson*, 507 U.S. at 363 (finding that, even though two separate contracts between the parties

"led to the conduct that eventually injured the [plaintiffs], they are not the basis for the [plaintiffs'] suit"); *Rodriguez*, 2020 WL 6561448, at *10.  Ultimately, plaintiffs seek greater procedural fairness in IDB's investigation and prosecution of the charges against them, not the specific performance of an enumerated duty under one of the three challenged contracts.

Plaintiffs do not contest that their claims center on alleged violations of the Sanctions Procedures, *see* Pls.' Mem. at 31–32; Pls.' Reply at 6–7, but argue that, because the Sanctions Procedures were supposedly "imposed" pursuant to the three challenged contracts and are analogous to investigatory and disciplinary proceedings undertaken by many private entities, the IDB's proceedings against them constitute commercial activity, *see* Pls.' Mem. at 32; Pls.' Reply at 6–14.  At the outset, in making this argument, plaintiffs rely on a number of considerations that are foreclosed by precedent and the FSIA itself.  For example, plaintiffs contend that "misconduct in internal administrative proceedings forms a basis for breach of contract claims," Pls.' Reply at 7, but the Supreme Court has specifically admonished that a reviewing court must not "individually analyz[e] each of the [plaintiffs'] causes of action" to determine whether the commercial-activity exception applies, *Sachs*, 136 S. Ct. at 396.  Likewise, plaintiffs suggest that IDB sanctions proceedings are commercial activity because "the Bank's purpose in imposing sanctions is purely commercial, and is for the purpose of determining whether the Bank would like to continue doing business with commercial partners in the future."  Pls.' Reply at 10.  As explained above, however, the text of the FSIA plainly states that "the nature of the course of conduct or particular transaction or act, rather than . . . its purpose" determines whether it is commercial activity.  28 U.S.C. § 1603(d); *see also Weltover*, 504 U.S. at 614.  Plaintiffs' reliance on how the IDB has characterized its Sanctions Procedures elsewhere, *see* Pls.' Reply at 9, is unpersuasive for the same reason.

23

Plaintiffs' only remaining argument, then, is that the internal proceedings against them, and IDB's alleged misconduct in the course of those proceedings, are commercial activity because of their "fundamentally commercial nature." *Id.* at 8. Turning once again to the premise that the gravamen of this suit consists of the three contract-related claims they have pled, plaintiffs contend that "[i]t is well established that engaging in transactions with a third party for goods or services constitutes 'commercial activity,' regardless of the purpose of the transaction." *Id.* (citing *Broadbent v. Org. of Am. States*, 628 F.2d 27, 34 (D.C. Cir. 1980)). First, this Circuit's precedent takes a more nuanced approach to evaluating the import of contracts entered into by foreign governments or international organizations, under which "a contract between a foreign state and a private party for the purchase of goods and services . . . is not inevitably . . . 'commercial activity.'" *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1549 (D.C. Cir. 1987); *see also Millen Indus., Inc. v. Coordination Council for N. Am. Affs.*, 855 F.2d 879, 884–85 (D.C. Cir. 1988); *Rodriguez*, 2020 WL 6561448, at *10 ("Merely making a contract is not necessarily commercial activity under the FSIA.").[4] More importantly, whether the challenged contracts themselves constitute commercial activity does not determine the applicability of the commercial-activity exception to this case because, as explained above, the procedural violations that plaintiffs allege took place in the course of the sanctions proceedings against them—not the challenged contracts for services between IDB, the Government of Barbados, and plaintiffs' employers—are the "gravamen" of this suit.

---

[4] Even if plaintiffs' characterization of the case law were accurate, after *Jam*, the force of this purported rule, as applied to international organizations, is ambiguous. In determining that the FSIA "governs the immunity of international organizations," the Supreme Court in *Jam* noted, without deciding, that "it is not clear" that even "the lending activity of all development banks qualifies as commercial activity within the meaning of the FSIA." *Jam*, 139 S. Ct. at 772. That question, however, need not be resolved because the true gravamen of this suit, the procedural violations plaintiffs allege, is not commercial in nature.

IDB contends that its investigations of alleged Prohibited Practices and resulting sanctions proceedings, far from being commercial activity, "are a quasi-judicial process through which it adjudicates whether parties have committed Prohibited Practices and decides whether to" impose sanctions.  Def.'s Opp'n at 18.  The bank therefore regards these activities as "analogous to" efforts by governments "to identify fraud, waste, and abuse in government-funded programs and to debar contractors found to have engaged in such practices," *id.*, citing to the example of the adjudicative process set forth in the Federal Acquisition Regulation, *see generally* 48 C.F.R. § 9.4, to debar contractors with the United States Government who engage in fraud or corruption, *see* Def.'s Opp'n at 5–6, 17–18; Def.'s Reply at 6–8.  The IDB Charter and Sanctions Procedures support this characterization.

Just as a sovereign has the authority to root out fraud and corruption in the use of public funds, the IDB has been charged by its member states with "tak[ing] the necessary measures to ensure" that bank funds "are used only for the purposes for which" they are allocated.  IDB Charter art. III, § 9(b).  Its jurisdiction in this regard extends beyond its contractual partners to reach any party with any affiliation, however remote, to an IDB-financed project, including as an employee of a contractor, subcontractor, or other third party.  Sanctions Procedures §§ 1.2, 2.2. IDB's OII, like a government agency with the mission of protecting the public fisc by investigating and prosecuting potential misuse of public money, has the responsibility of carrying out IDB's duty to safeguard its funds.  OII achieves this goal by completing an investigation pursuant to the Sanctions Procedures, *see id.* §§ 3.1–3.4, referring any resulting charges to a Sanctions Officer, *id.* §§ 3.3, 3.4, and prosecuting the charges before the Sanctions Officer and, eventually, the Sanctions Committee, *see id.* §§ 4.1–4.10, 6.2.  The Sanctions Officer and Sanctions Committee next provide a three-step review process, with an opportunity

for the charged entities or individuals to respond at each stage, akin to the familiar process of administrative adjudication followed by de novo judicial review.  *See id.* §§ 4.1, 4.7, 4.9, 6.1, 7.1, 7.2.  Altogether, these extensive procedures mirror the steps a government might take to protect public funds, deter fraud and corruption, and penalize wrongdoers.

In addition, at the end of the proceedings, IDB has the authority to impose sanctions, ranging in severity from a reprimand to debarment, with consequences beyond the specific contract in relation to which they are introduced.  *See id.* § 8.2.  The most severe IDB sanctions may limit or eliminate an individual or entity's ability to operate in the international development ecosystem of which IDB is a part.  *See id.*  In other words, the Sanctions Procedures may functionally remove the sanctioned entity or individual from participation in the market, a result typically achieved by a "regulator" of a market rather than a private party acting within that market.  *Weltover,* 504 U.S. at 614.  When it seeks to root out fraud and corruption in the use of its funds through these procedures, then, IDB acts as a sovereign rather than a private entity—put simply, it does not undertake commercial activity.

Plaintiffs level several challenges against this common-sense characterization of IDB's extensive investigation and sanction procedures as noncommercial.  First, they complain that, while parties to an administrative action may bring their claims to court when an administrative adjudication ends, they have no similar option under the Sanctions Procedures and, in the absence of review by this Court, the IDB's "process is absolutely beyond review . . . by anyone." Pls.' Reply at 11; *see also id.* at 10–11.  IDB counters that "[j]udicial review of [its] sanctions decisions by the courts of [any member state] would be neither practical nor appropriate."  Def.'s Reply at 7.  Indeed, the delay and frustration of the sanctions proceedings that would result from litigation in member states' courts, in addition to the potential for competing or contradicting

rulings, would undermine the entire scheme by which IDB attempts to maintain the integrity of its funds and projects, as its Charter requires.

Faced with similar consequences in the context of international organizations' relationships with their employees, the D.C. Circuit concluded that "[d]enial of immunity opens the door to divided decisions of the courts of different members states passing judgment on the rules, regulations, and decisions of . . . international bodies," which "would undermine the ability of the organization[s] to function effectively," *Broadbent*, 628 F.2d at 35, in contravention of the general rule that "no member state may take action to hinder" an international organization, *id.* at 34; *see also Mendaro v. World Bank*, 717 F.2d 610, 615 (D.C. Cir. 1983).  These functional considerations counseled in favor of deeming "the relationship of an international organization with its internal administrative staff" to be "noncommercial" for FSIA purposes.  *Broadbent*, 628 F.2d at 35; *see also Int'l Bank for Reconstr. & Dev. v. District of Columbia*, 171 F.3d 687, 689 (D.C. Cir. 1999) (finding that "intrusion into [an international organization's] decision-making processes . . . would contravene [its] statutory independence").  Dismantling IDB's Sanctions Procedures by subjecting them to time-consuming and disruptive judicial review in the courts of its member states, at the expense of this international organization's ability to police misuse of its funds, would wreak similar havoc on the bank's ability to carry out its mission of promoting social and economic development in the Americas.  This threat, in combination with the inherently sovereign nature of the sanctions proceedings, supports the finding that IDB's investigations of Prohibited Practices and its Sanctions Procedures are not commercial in nature. Moreover, the Sanctions Procedures themselves provide ample opportunity for review, including of the procedural claims plaintiffs seek to vindicate here.

In an attempt to show that the IDB's sanctions proceedings "are the *type* of actions by which a private party engages in trade and traffic or commerce," *Weltover*, 504 U.S. at 614 (internal quotation marks omitted), plaintiffs next compare the Sanctions Procedures to "processes . . . regularly undertaken in a variety of contexts based on contractually applied procedures, including university student and employee discipline proceedings and hospital decisions to revoke or restrict physician privileges," Pls.' Reply at 12, and to "[f]ormal investigations and disciplinary actions . . . carried out by private companies with respect to third parties," *id.* at 13.  They contend that the prevalence of these investigatory and disciplinary systems in various sectors demonstrates that private parties engage in the type of activity IDB has undertaken by investigating and prosecuting charges against plaintiffs.  *See id.* at 12–14. This analogy fails to show that IDB has engaged in commercial activity because, while the processes to which plaintiffs point may mirror the Sanctions Procedures in form, they differ significantly in function.

Plaintiffs' examples are of procedures used by organizations to investigate and, if necessary, discipline individuals with whom they have a contractual relationship.  In contrast, though plaintiffs protest that "[i]t is only through [its contractual] arrangements that IDB is able to claim authority to investigate and sanction individuals and entities under the . . . Sanctions Procedures," Pls.' Mem. at 32, IDB's jurisdiction to initiate sanctions proceedings comes from its Charter, *see* IDB Charter art. III, § 9(b), not from its contracts with third parties.  Thus, IDB uses the Sanctions Procedures to investigate and discipline third parties for any alleged misconduct taken in relation to IDB funds, regardless of whether a direct relationship exists between IDB and the third party.  *See* Sanctions Procedures §§ 1.2, 2.2.

The import of this distinction is apparent.  Neither a university nor a hospital could subject a contractor's employee who embezzled funds while working on the contract to its internal disciplinary process, but as plaintiffs' own case makes clear, the IDB can.  None of the three plaintiffs are members of the IDB, nor even direct parties to a challenged contract with the IDB, but the IDB's member countries have nonetheless granted it jurisdiction to internally prosecute their offenses pursuant to Article III, section 9(b) of the IDB Charter.  A university or a hospital might be able to bring suit against a similarly situated individual accused of some wrongdoing in relation to a contract, but has no authority to pursue any equivalent sanctions, or to take any direct action at all, in the absence of a contract with the individual.  Likewise, though audit and investigation procedures may be, as plaintiffs assert, common to "any effective compliance program in the private sector," Pls.' Reply at 14, they also depend on a contractual relationship between the investigating entity and the subject of the investigation in the first instance.  IDB's ability to identify and penalize wrongdoing by any party within the sphere of its projects clearly indicates that its investigatory and prosecutorial functions with regard to Prohibited Practices are the type of activities undertaken by a government entity entrusted with protecting public funds by pursuing fraud and corruption charges or regulating a market, not a private party.

For similar reasons, plaintiffs' claim that the Sanctions Procedures "are the type of activity private parties regularly engage in to determine whether they wish to continue doing business with commercial partners," Pls.' Mem. at 32; *see also* Pls.' Reply at 10, is unpersuasive. IDB's jurisdiction under its Charter and the Sanctions Procedures extends beyond its direct commercial partners to reach any individual who comes into contact with any part of an IDB-financed project in their personal capacity.  *See* IDB Charter art. III, § 9(b); Sanctions Procedures

§§ 1.2, 2.2.  The organization is further empowered not only to decide that IDB will not do business with an entity or individual, but also to prohibit its commercial partners from doing business with those entities or individuals in relation to IDB-financed projects, with the effect of functionally removing certain actors from the international development market in which IDB operates.  *See* Sanctions Procedures § 8.2.2.  IDB's sanctions proceedings are therefore more similar in both scope and severity to the regulatory and prosecutorial functions of a sovereign than to the contractual compliance processes utilized by private actors.

Finally, plaintiffs claim that, separate from IDB's alleged violations of its Sanctions Procedures, its alleged "tortious interference" with PAE's performance of its obligations to plaintiffs under the indemnification clause of the GreenLine Purchase Agreement is "based on commercial activity."  Pls.' Reply at 15; *see supra* Part I.B.  At bottom, however, plaintiffs' tortious interference claim challenges the manner in which IDB carried out its initial investigation of the alleged Prohibited Practices, including the degree and nature of PAE's cooperation in that investigation, and the extent to which IDB complied with its obligation under the Sanctions Procedures to provide plaintiffs with all relevant, exculpatory, and mitigating evidence.  For the reasons already explained, these activities do not constitute commercial activity within the meaning of the FSIA.

Context is also key to this determination.  Plaintiffs cite to *Youming Jin v. Ministry of State Security*, 475 F. Supp. 2d 54 (D.D.C. 2007), for the proposition that "alleged attempts to interfere with the plaintiffs' contract strips [otherwise-immune] defendants of immunity under [the] FSIA because an individual, acting in their private capacity, could interfere with a contractual relationship," *id.* at 65; *see* Pls.' Reply at 15.  That case is inapposite, however, because the defendant foreign government agencies there offered "various commercial

incentives" to sever plaintiffs' contract with a television station.  *Youming Jin*, 475 F. Supp. 2d at

65.  As the court recognized, a private party could have attempted similar interference in

plaintiffs' contractual relationship.  *See id.*  The alleged interference here, in contrast, is that of

asking an entity in a contractual relationship with plaintiffs to cooperate in IDB's Prohibited

Practices investigation and, in the course of that investigation, limiting the extent to which the

entity provided information and assistance to plaintiffs.  In this prosecutorial and regulatory

context, unique to sovereigns and international organizations, the interference alleged by

plaintiffs could not have been replicated by a private party.  This fact, not the fact that plaintiffs

have pled a claim that could equally be alleged against a private party, is dispositive.

In short, the gravamen of plaintiffs' claims—IDB's investigation of alleged Prohibited

Practices and pursuit of Sanctions Proceedings against them—is not commercial activity because

it is the type of activity a sovereign might undertake to protect the integrity of public funds.  The

scope of IDB's jurisdiction under its Charter and the Sanctions Procedures, the sanctions

available to it, and the Procedures themselves all support this conclusion.  The commercial-

activity exception therefore does not apply to abrogate IDB's immunity.

### C.   FSIA's Waiver Exception Is Also Inapplicable

Plaintiffs next contend that Article XI of the IDB Charter waives the organization's

immunity from this type of suit, such that the FSIA's waiver exception is satisfied.  Pls.' Mem. at

32–34; Pls.' Reply at 16–18; Compl. ¶ 7.[5]  The waiver exception "applies to any case in which

the foreign sovereign [or international organization] 'has waived its immunity either explicitly or

---

[5]      In their briefing, plaintiffs argue that the IDB Charter waives IDB's immunity without explicitly referring
to 28 U.S.C. § 1605(a)(1).  *See* Pls.' Mem. at 32 ("Even if the broader FSIA exceptions did not apply to this case,
IDB's own charter waives immunity from this type of suit."); Pls.' Reply at 16–18.  Their Complaint, however,
alleges that IDB is not immune from suit "[p]ursuant to 28 U.S.C. §§ 1605(a)(1) and 1605(a)(2)," Compl. ¶ 7,
thereby invoking the waiver exception.

by implication.'"  *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 583

(D.C. Cir. 2020) (quoting 28 U.S.C. § 1605(a)(1)); *see also Creighton Ltd. v. Qatar*, 181 F.3d

118, 125–26 (D.C. Cir. 1999).  In addition, the IOIA itself deprives international organizations of

immunity "to the extent that such organizations may expressly waive their immunity for the

purpose of any proceeding or by the terms of any contract."  22 U.S.C. § 288a(b); *see also*

*Nyambal v. Int'l Monetary Fund*, 772 F.3d 277, 280–81 (D.C. Cir. 2014).

The D.C. Circuit has construed Article XI, section 3 of the IDB Charter, *see supra* Part

I.A.1.a, as a limited waiver of immunity, but has also made clear that this provision, like similar

language in the charters of other international financial institutions, is not "a blanket waiver of

immunity from every type of suit not expressly prohibited elsewhere in" the IDB Charter,

*Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335, 1338 (D.C. Cir. 1998), *abrogated on other*

*grounds by Jam*, 139 S. Ct. 759; *see also Vila v. Inter-Am. Investment Corp.*, 570 F.3d 274, 278–

79 (D.C. Cir. 2009) (interpreting "nearly identical" language in the Inter-American Investment

Corporation charter to waive immunity only from certain suits); *Mendaro*, 717 F.2d at 614–15

(determining that court was "unable to read" identical language in the World Bank charter "as

evincing an intent by the members . . . to establish a blanket waiver of immunity from every type

of suit not expressly prohibited by reservations").[6]  Rather, such provisions waive the

organization's immunity only "from suits by its debtors, creditors, bondholders, and those other

potential plaintiffs to whom the Bank would have to subject itself to suit in order to achieve its

chartered objectives."  *Mendaro*, 717 F.2d at 615; *see also Zhan v. World Bank*, No. 19-cv-1973

(DLF), 2019 WL 6173529, at *3 (D.D.C. Nov. 20, 2019).

---

[6]     The parties agree that, although the Supreme Court's decision in *Jam* overturned *Atkinson*'s interpretation
of the IOIA as conferring upon international organizations the virtually absolute immunity from suit enjoyed by
foreign governments when the law was first enacted, *see Jam*, 139 S. Ct. at 770–72, the *Atkinson* Court's
interpretation of Article XI, section 3 remains good law, *see* Pls.' Mem. at 33; Def.'s Opp'n at 20 & n.9.

Under the law of this Circuit, then, the "default rule" is that an "[organization]'s immunity should be construed as *not waived* unless the particular type of suit would *further* the [organization]'s objectives."  *Atkinson*, 156 F.3d at 1338; *see also Vila*, 570 F.3d at 368–69; *Mendaro*, 717 F.2d at 617 ("A nonspecific waiver . . . should be more broadly construed when the waiver would arguably enable the organization to pursue more effectively its institutional goals.").  Application of this test focuses on "whether a waiver of immunity to allow this *type* of suit, by this *type* of plaintiff, would benefit the organization over the long term," *Osseiran v. Int'l Fin. Corp.*, 552 F.3d 836, 840 (D.C. Cir. 2009), for example, by "mitigat[ing] possible hesitancies" by external parties "to negotiating and entering into formal contracts with" the organization, *Vila*, 570 F.3d at 282.  International organizations thus have been found to have waived their immunity from suit by debtors to enforce loan agreements, *see Lutcher S.A. Celulose e Papel v. Inter-Am. Dev. Bank*, 382 F.2d 454, 459–60 (D.C. Cir. 1967), and in matters arising from "commercial transactions with the outside world" such as "*external* relations with its debtors and creditors," *Mendaro*, 717 F.2d at 618.

Plaintiffs attempt to avail themselves of this limited waiver of immunity by characterizing themselves as "commercial 'partners' of the [IDB]" due to their "having been contracted to perform services and delivering those services to the Bank."  Pls.' Reply at 16.  In contrast to the many cases in this Circuit to have determined that international organizations are immune from suit in "actions involving claims by [an organization's] employees or former employees," *id.*, they contend, their "claims involve [IDB]'s external commercial relations," *id.* at 18.  Allowing their suit to advance would therefore promote IDB's long-term organizational interests by "provid[ing] reassurance to [IDB]'s external partners that the Bank will not act

arbitrarily, capriciously, or in bad faith in dealing with persons involved in commercial transactions with the Bank." *Id.*

As plaintiffs correctly observe, this Circuit has recognized that "[o]ne of the most important protections granted to international organizations is immunity from suits by employees of the organization in actions arising out of the employment relationship," *Mendaro*, 717 F.2d 615, and has distinguished lawsuits arising from true commercial transactions from "the harassing interference . . . of allowing a type of employee suit where an organization operates in many different countries," *Vila*, 570 F.3d at 282; *see also, e.g.*, *Broadbent*, 628 F.2d at 35 (upholding an organization's immunity from a suit brought by employees alleging breach of their employment contracts); *Sampaio v. Inter-Am. Dev. Bank*, 806 F. Supp. 2d 238, 245 (D.D.C. 2011), *aff'd*, 468 F. App'x 10 (D.C. Cir. 2012) (same).  No court has held, however, that Article XI, section 3 of the IDB Charter, or similar language in the charter of any other international organization, preserves immunity only with respect to claims brought by employees.

Regardless of whether a suit is brought by an organization's employees or external parties, the question remains whether "the benefits accruing to the organization as a result of [a] waiver [of immunity] would be substantially outweighed by the burdens caused by judicial scrutiny of the organization's discretion to select and administer its programs," or whether the suit in question "could significantly hamper the organization's functions."  *Mendaro*, 717 F.2d at 617.  *Mendaro* and its progeny establish a presumption that suits by employees will not serve these ends and are therefore foreclosed, but in no way suggest that immunity is waived as to any suit brought by a party other than an employee, or indeed any suit brought by a commercial partner of an organization.  *Mendaro* itself recognizes that the primary purpose of clauses such as Article XI, section 3 is "to enhance the marketability" of an international organization's financial

products "and the credibility of its activities in the lending markets." *Id.* at 618.  Courts have

thus allowed suits by "debtors and creditors" of international organizations to "enforce [their]

contracts" to proceed in furtherance of these goals.  *Id.*  This narrow waiver of immunity

recognizes not, as plaintiffs suggest, litigants' mere identity as "commercial partners" of an

international organization, *see* Pls.' Reply at 16, but rather the need for an international financial

organization, in order to encourage private parties to do business with it, to provide

"reassurance" that its partners "would be fairly compensated" if their contract fails, *Vila*, 570

F.3d at 282.  Commercial partners, like any other litigants, therefore must show that waiver of

immunity as to their claims would promote the long-term objectives of the organization.  *See*

*Atkinson*, 156 F.3d at 1338.[7]

Plaintiffs' claims in this case, alleging violations by IDB of its internal Sanctions

Procedures in the course of the sanctions proceedings against them, do not satisfy this standard.

As explained above, proceedings undertaken by IDB pursuant to its Sanctions Procedures are not

commercial activity.  *See supra* Part III.B.2.  Rather, they are internal investigatory and

prosecutorial proceedings intended to ensure that those entrusted with IDB funds use them in

furtherance of the projects, connected to IDB's mission of promoting social and economic

development in the Americas, for which they are allocated.  As IDB correctly cautions,

"allowing [p]laintiffs' suit to proceed would provide a roadmap for subjects of sanctions

proceedings to halt or delay those proceedings by filing suits in the courts of the IDB's member

countries."  Def.'s Opp'n at 21; *see also* Def.'s Reply at 9–10.  This frustration of IDB's ability

to investigate and penalize misuse of funds and other Prohibited Practices would prevent IDB

---

[7]     Even if IDB's immunity were presumptively waived as to suits brought by its commercial partners, such a
rule likely would not abrogate IDB's immunity as to the claims brought by these plaintiffs, none of whom were
parties to any of the challenged contracts.  *See supra* Part I.A.2; *Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank*, 251
F. Supp. 2d 126, 132 (D.D.C. 2003).

from expeditiously rooting out corruption in its projects and therefore from safeguarding its

funds.  Even if IDB might, as plaintiffs proffer, benefit from providing some "reassurance"

through a waiver of immunity here that it "will not act arbitrarily, capriciously, or in bad faith in

dealing with persons involved in [its] commercial transactions," Pls.' Reply at 18, that limited

benefit would obviously "be substantially outweighed by the burdens caused by judicial scrutiny

of [IDB's] discretion to" promptly police alleged misconduct by participants in its projects,

*Mendaro*, 717 F.2d at 617; *see also Zhan*, 2019 WL 6173529, at *3.  "This clear lack of

benefit—indeed, disadvantage—of a waiver of immunity . . . compels the conclusion that

[Article XI,] Section 3 of the [IDB Charter] should not be construed to waive the Bank's

immunity in this case."  *Atkinson*, 156 F.3d at 1338–39.

      Plaintiffs have thus failed to demonstrate that either the commercial-activity exception or

the waiver exception to the FSIA applies.  IDB is therefore immune from this suit pursuant to the

IOIA.  As a result, this Court lacks subject-matter jurisdiction and must necessarily dismiss this

case under Rule 12(b)(1).  For the same reason, the merits of plaintiffs' Motion for Preliminary

Injunction cannot be considered.

## IV.     CONCLUSION

      For the foregoing reasons, the IDB is immune from this suit under the IOIA and as a

result, this Court lacks subject-matter jurisdiction.  IDB's Motion to Dismiss is therefore granted

and plaintiffs' Motion for Preliminary Injunction is denied as moot.

      An order consistent with this Memorandum Opinion will be entered contemporaneously.

      Date:  April 5, 2021

                                         _____

                                         BERYL A. HOWELL

                                         Chief Judge